at all, number 08-1889. Mr. Levy and Mr. Furlong. Good morning, Your Honors. My name is Robert Levy. I'm representing the appellants Younger, Nauvak, and Wollion, and I would request that I be able to reserve five minutes for rebuttal  Thank you, Mr. Chairman. The plaintiff has claimed in this case, and the district court has ruled, that qualified immunity does not apply to police officers Younger, Nauvak, and Wollion predicated upon the manner in which a domestic violence TRO was served, predicated upon a theory of state-created danger. The arguments of counsel... Ms. Soberal was in, when she came in to register the complaint on this awful evening, she was in the, in effect, under the protection of the police officers, was she not? She was at the police station, and she was filing a complaint with police officers, but I'm not sure I would say that she was under the protection of the police department. She certainly wasn't in custody. She certainly went there to get protection, did she not? That's correct. She looked for a judicial temporary restraining order, and the mechanism by which she gets the restraining order is to file a complaint with police officers, and she was at the police station. Okay. It's our position that the arguments of the court and arguments of counsel is contrary to the provisions of, and the principles of the United States Supreme Court case, the town of Castle Rock versus Gonzales, and of course, contrary to the Borrella case, which I know that Judge Ambrose participated on that panel. The facts do not meet any of the elements of the state-created danger. The facts, as alleged by Plaintiff, and what specifically is alleged here is, leaving Reyes armed. You mentioned Borrella. I was on the panel on Borrella, also on the panel on Rivas. They seem to get all of these just by the luck of the wheel, I guess. And I think Judge Roth was on the Smith 2 case, which was decided as well. In fact, in that case, I think the opinion read that close calls must be given to the police officers, and in this case, it's our position that it's not a close call. The argument that's made by the court and the argument that was made by counsel that there was a constitutional violation and unqualified immunity should not be applied because the officers left Reyes unarmed and unsupervised. What's the affirmative act? Isn't that a failure to act rather than an act? Exactly. But a failure to act is not the standard that we have adopted in this court. We need some action. You agreed that leaving him armed is a failure to act rather than an act. And I'm the appellant. The district court ruled that state-created danger applies in this case. I'm sorry. I'm sorry. You are. Yes. That's not nearly as bad as what I once did. I once was asking counsel questions, and he's looking at me, and he's looking at me, and I keep asking questions. Finally, it dawned on me that I was asking questions on the next case. Did you get appropriate answers? The very point that you raise, the fact that the allegation is leaving Reyes armed and unsupervised is multileveled with respect to the analysis of this case. First of all, there was no affirmative act. Secondly, there was an immunity that the state of New Jersey has, pursuant to New Jersey Statute 2C25-21-5, which basically says officers are exempt from liability for failure to seize a weapon pursuant to a TRO. Well, but that's after the facts of this case. No. No. I'm just getting to the point of that statute was in effect with this case. The second statute that was enacted was that officers who have weapons, who are on duty and are served with a TRO, cannot be forced to give up their weapon. But does that affect federal constitutional law? Well, it goes to shock. Can a state enact a statute that will preclude a court's federal analysis of action, whether it's constitutional or not? Under the state-created danger theory, which is an exception, apparently, to the qualified immunity, which our officers, I think, ought to be granted, one of the third prongs is that there needs to be a clearly established constitutional right. State-created danger is not, in and of itself, a constitutional right. It is a mechanism by which courts can determine whether or not a qualified immunity must exist. What I bring to the court's attention is that nine months after this incident, the New Jersey legislature, a deliberative body, says, you cannot take a weapon from an on-duty officer. So the question then is, if the New Jersey legislature, in its wisdom, says, this is what we believe the conduct should be, then how can the conduct against which it legislated against constitute a shocking to the conscience of the court? But I can go beyond that with respect to this analysis, simply because of the fact that the allegation is that the gun wasn't taken and he wasn't in custody. The fact of the matter is that there is no duty, or was no duty, on the part of any of the officers until and unless the domestic violence complaint was filed and an order issued. First of all, while the complaint was being discussed with the police officers and the municipal court judge, it was very clear that the allegations of the complaint were nonviolent. I'm being verbally harassed. But if you're younger and you're sitting in the room, in a room where you're talking with Sobral, and Reyes barges in, aren't you unnoticed that this is a very tense domestic relations situation? I'm not sure I would characterize it as barging in. He was not supposed to go in that room, was he? He wasn't directed not to. You mean he can just walk in while they're questioning somebody who's making a complaint against him? He should not. I agree with that, Judge. But the fact of the matter is when he came into the room, he was directed to go downstairs and he complied with the direction. There was nothing in Younger's mind to suggest that the officer involved, intended, was prone to, or had demonstrated any type of physical threat to Ms. Sobral. He complied with the order, and that is what Officer Younger knew, that this was a nonviolent complaint. He was calling her up saying, I love you, I love you, I love you. Please come back. Would it have made any difference if she had told Younger, and I realize there's no evidence that she did, that a message had been left on her machine that Reyes was contemplating suicide? It might. I don't think there's any evidence to suggest that, but I think that would only deal with one prong of a multi-prong analysis that has to take place with respect to state-created danger. The ultimate question is, was she placed affirmatively in more danger than she was by reason of official, in this case, police conduct? Well, let's go fast forward just a little bit. You've gone to the magistrate. The magistrate enters the order, and you are now to escort Ms. Sobral from the police station, and the order requires that you take Reyes' gun away, is that correct? Yes. Why would you march her, not only march her, but have her walk right past him? Well, at the time that Younger leaves upstairs, he has no knowledge as to where the officer is, other than the fact he directed him to go downstairs. At the time that he reaches the stairs and sees Reyes, now we're talking about the issue of a split-second decision. Sees Reyes, who still has his gun. That's correct. He could do one of two things. Don't forget he's armed. Don't forget the other police officers in the station are armed. There's been no evidence of violence, nor evidence that there was ever prone to violence. His decision was, in a split second, do I bring Reyes back upstairs, or do I bring Reyes and direct him to go into a police car? They, in fact, go outside of the building, not Younger, but two other officers, and Ms. Soberall. They walk a half a block away. They put her in the back of the police car to escort her home. There are two officers in the police car with her. What happens is, after she is escorted out, this individual, Reyes, runs out of the building, runs to the police car, kills her, and kills himself. So your question is, what should he have done? The real issue is, in that split second, was there a state-created danger, given the decisions that we've had in this Third Circuit concerning what that consists of? Would the officer have known that what he was doing was violative of constitutional state-created danger? So far you've discussed what Officer Younger did and was aware of. Is what he did or didn't do attributable to the other officers? No, and I think that Smith 2, which Judge Roth, I think, sat on, clearly says that the analysis that ought to be done is to analyze each officer's conduct. And did the court do that in this case? No, the court did not do that in this case, and you can see by the decision. But as you're arguing it, you're arguing it as what they did collectively. Well, what I'm arguing, Judge, is the fact that no matter what each individual officer knew or didn't know at the time, the general principles concerning state-created danger, the general principles concerning qualified immunity under Section 1983, as a matter of law, require that summary judgment should have been granted in this particular case. And that there is enough of a record here with respect to what happened and what was known by each of the officers to suggest that that analysis is, at this point in time, superfluous to the principles concerning the fact that there was no overt act. The only overt act is the fact that she was escorted down the stairs. That's the only affirmative conduct that has been raised by the plaintiff in this case. And the question that I ask is, under the state of the law, at the time that this occurred, the officers had no reasonable belief that what they did violated the law and constituted a state-created danger. Walking down the stairs, given the fact that what they were doing. Her argument was that being at the police station, getting the order against Reyes, walking down the stairs was in effect to put her in a zone of safety, was it not? And she was in a zone of safety when she was in the department. When she walked down the stairs, Reyes didn't pull his gun out. Reyes didn't shoot her in the police station. Reyes was told, come with me. We're going to serve you with this TRO. He had complied with two other previous verbal commands. There was no reason to believe that he would not comply with the command, please come with me. If he was so enraged and so motivated to violence, the question is when she was in the building, why wasn't she shot then? And the real shocking facts is not the conduct of my clients. It's the conduct of Reyes. That's what shocks the conscious, that this individual who was verbally trying to contact Ms. Soberall would unexpectedly, in the minds of these officers, rise to the level of commission of murder. But the conduct of the officers do not shock the conscious. None of the elements have been met. All of the elements with respect to qualified immunity have been met. Thank you. We'll hear from Mr. Furlong. Good morning, Your Honor. Mr. Levy, Mr. Zepelli, may it please the Court, John Furlong, Furlong and Krasny on behalf of the estate of Soberall. Well, you know where I stand. Yes. Affirmative acts. Why don't you tell me, explain to me what the affirmative acts are. Two critical affirmative acts. First, they ordered Reyes to remain in that police station. They ordered him to remain, knowing that she's upstairs, knowing that he has already burst into the office. I think the use of the verb burst would be more accurate than, well, they didn't order him not to. Of course, if you or I, Your Honor, had tried to walk into a police station, into an office where the domestic violence victim is being interviewed, we wouldn't have made it to the threshold. Aren't they better off with him in the building rather than lurking outside the building somewhere? I'd like to think they would have been better off if they had ordered him to one of the other districts, like they had done on the prior domestic violence. But, I mean, if you order him out the door, God knows where he goes. Well, you have an infinite number of possibilities. Especially with a gun. Putting him in the snake pit doesn't help. Unless you have someone who takes him and physically takes him somewhere else. But are we in a situation where that is appropriate? Yeah, I honestly think we are, Your Honor. I honestly think that it is clear in these materially disputed facts that the conduct of the supervisors was to give him an opportunity to talk her out of it because they knew his career was shot. And that's really where he was. This wasn't his first DV. It wasn't his first DV with this woman. Okay, you are saying that Affirmative Act is ordering him to stay in the building rather than to leave the building. And to lie about it. And to lie about it. Look, the first thing Lieutenant Nalback did when she comes in and says, I need a restraining order against this guy. This is the second time in five months, and this is the third time I've reported him in six. But I need a restraining order, and I need it done tonight. And it's very disingenuous, not for counsel, but for the witnesses themselves to argue repeatedly, so far it's just harassment. Well, just harassment with an armed guy who's now, count him, five DVs in his history that they know about because Commander-in-Chief Wollion received the reports when he was the captain of the district, and we have a tape of them talking about, yeah, we remember the last time. We know they've seen the reports. But that's why the officer at the hearing before the magistrate says, look, I'm not going to vouch for it. Because the magistrate really didn't want to enter this order taking the person's gun away. He did in the end. But the problem here when you have such difficult cases like Castle Rock from the Supreme Court, Borrella from our court, which follows what the Supreme Court has done, is that it looks here as if the most that you can accuse these officers of is negligence. Maybe they were negligent. Maybe they didn't follow the right protocols. But where did they affirmatively do something that put this person in greater danger than she otherwise would have been? If I can answer the question in two parts. Go ahead. Can we take Castle Rock and Borrella off the table? Those are 14th Amendment procedural due process claims involving private persons out in the street. This is a substantive due process, nothing to do with Borrella or Castle Rock other than that they both exist under the 14th Amendment right, but the substantive due process right in the State Created Danger Doctrine is recognized and the passive procedural due process right is not. If we could, can we just suspend? But doesn't the question still come back to qualified immunity for the police officer? We'll get to qualified immunity. Let me finish answering Your Honor's other question. When police officers who are routinely trained on domestic violence procedures have a wealth of information as they did here, it is not, there's a reason it's called common sense because it's common to all of us. It's not unreasonable to assume from the set of facts here that they deliberately created a construct in violation of all of their own procedures to see if they could save this guy's job. That's really the conscience-shocking aspect of this. They knew from moment one when she came in, can we talk you out of reporting this to Internal Affairs? No. Okay. Well, then let's get Sergeant Younger in here. Sergeant Younger doesn't know any of the players. He doesn't know about the background. Two, they send her upstairs to see Sergeant Younger and then Mr. Bagigalupo, who's sitting maybe three feet away from where Rolion and Nalback are sitting, takes a call from Reyes and says, yeah, the maniac's upstairs, why don't you swing by? He did say that. I mean, Reyes asked, is the maniac there? And all the police officers said, yes, she is here. Yes. Why don't you swing by? He did not call her a maniac. I'm sorry. You are correct. It was Reyes's term. Again, if Reyes is calling her a maniac, what does that tell us in the domestic department? Well, if Reyes is calling the station, it's because he thinks she's there. Yeah. And because she is the one who had called his beeper. She texted him or rather beeped him that that's where she was. But he's also talking to his ex-wife at the same time. But in any event, he's invited into the station. So it's not like the police say, she's here, come in. It's like he is confirming whether she's there or not. He's confirming whether she's there, and he says, why don't you swing by? Now, you say that's not an invitation. That's how I would interpret that. That being said, it occurs within auditory distance of Nalback and Rolion. But that's Bagigalupo who's not – is he a defendant? He is no longer a defendant, Your Honor. I believe he was too attenuated by virtue of the fact that he then left the station before Reyes even shows up. He was ordered out on patrol. But isn't it an affirmative act by the defendants that we need to look at? Yeah, and I'm saying that there is a wealth of information in this record from which one can infer their affirmative conduct. How does Bagigalupo know she's upstairs? In a later tape, you hear Nalback saying, someone must have told him that she was here. Well, I think it's a reasonable inference that the someone who told him was either Nalback or Rolion. Well, don't we have to look at the specific conduct of each named defendant? Exactly, we do. And exactly what Nalback did was try to minimize this from the get-go. He then attempted – Well, minimizing isn't affirmative conduct. No, but what minimization is is it gives you his mindset when we're analyzing conscience-shocking behavior. When they order him to remain, knowing that she's upstairs, when the protocol is send him to a different district, we know what their mindset is. When they doctor the log after the fact to try to contend that the guy went back out on patrol when clearly he did not, that gives you evidence of his state of mind that he knows he's causing a problem or has caused a problem. Counsel, you keep – And then he lies in deposition. I'm in the same boat. I'm sorry. You keep referring to they, and in response to Judge Roth, you apparently are aware of the Smith case that requires the district court to look at each officer's conduct. And you haven't talked about each officer's conduct. I apologize because I got carried away. Why don't you start with Lieutenant Nalback. Lieutenant Nalback, in my judgment, is fully aware of the situation, and in the opening call he tries to talk Bullion out of involving internal affairs. I literally went through this in my brief in some detail, so I can refer you to my brief because I broke them out one at a time. But in any event, Nalback – No, I want to know if the judge did it, not whether you did it. Okay. The judge made reference to each of the conversations that would suggest that Nalback is the one who ordered Reyes to remain because there's a conversation between him and Younger when Younger says, I sent him back downstairs. Yes, I told him to remain downstairs by the cage, which, by the way, is at the bottom of where the stairs where she's going to be coming downstairs. Okay, so Nalback is clearly ordering him to remain there, and Nalback is – Bullion is the one making arrangements for her to be escorted home, so she's going to have to come in front of where Reyes is. How is ordering him to remain in the station putting her in greater danger than if he had been told to get out of the station when, in fact, it's outside of the station that he killed her anyway? Again, he said that half a block away. It's right across the street. It's approximately 20 steps where they park the cars out in front of the station house. Granted, I suppose ordering him to remain would be no different than ordering him to go stand across the street, but the fact that they ordered him to remain means that he's going to see her coming down, and he knows when she comes downstairs with a police escort that she has a TRO in her hand. He knows his career is gone because they told him after the last time, if this happens again, your career is over. So with all due respect, Judge, I appreciate that there are an infinite number of possibilities, but the one they chose was not a good one. They ordered him to remain. It's a small, confined space. He would have had to have been in her proximity, and then they lied about it afterwards and literally concocted the evidence to try to make it look like the guy left. You're going back to user Bay. Let me finish answering your question, Your Honor. In any event, that's what Nalbach did. Wolian, who is also aware of all of the background, is also the one who says, I ordered him to go back outside. Obviously, he did not. But Wolian is the one who says, Younger, you go upstairs, and I can see him coming in, and I'm going to, as the guy in charge, let him come downstairs with you, even though you've told me that he burst into the room upstairs. Younger is the one who takes the order, and after seeing him come in, lets them know that he burst in, and then says, I'm going to walk you downstairs. Wasn't there some evidence, by the way, with respect to Wolian, that he ordered Reyes and his partner to leave the station? Some evidence is Wolian's. He claims I told him to leave the station. But, in fact, they never left the station. There is a wealth of evidence that they never left the station, starting with the surviving partner. We never left the station. Two, he took phone calls. He, Reyes, took phone calls from his estranged or ex-wife at that point, Nilsa Reyes. I'm at the station. Three, they had a repeated number of tapes where the radio room is saying, Have you left the station yet? No, we're still here on a personal. And, in fact, Nalbach tells them, tells the radio room, No, I've ordered him to remain here on an administrative or on a personal. So, clearly, they never left the station. But Wolian is trying to claim, Oh, I thought I saw them leave. And the fact that they would lie under oath in their deposition, I don't think redounds to their benefit in terms of the immunity argument. Okay, but we need an affirmative act. And I'm saying ordering him to remain and then ordering her brought downstairs, escorting her. Again, I appreciate counsel's trying to inject the hyper-pressurized environment. This is a deliberate environment. We had hours to figure this out, and there was no countervailing emergency that would have required them to say, My hair's on fire. I've got to make a split-second decision. The only time that comes up is in response to Judge Ambrose's question about you come out the door and he's right there. You know he's right there. They told you he's down by the cage. That's at the foot of the steps. The report room is the hallway at the foot of the steps. Jersey City Police Departments are not as well endowed as this courtroom. It's about one-eighth the size of this courtroom. It's a small, confined space. Let me go back to the question that follows up on that of Judge Alarcon. What's your theory of liability that implicates all three officers individually, Nalbach, Wollion, and Younger? I'm saying with respect to each of them, each of them was individually responsible. First of all, they're the three command officers at the scene, Wollion being top. Nalbach is the lieutenant in charge of that district, and Younger is the sergeant who's responsible for taking the DV complaint. Younger is the one who escorts her down. Nalbach and Wollion are the ones who order him to remain and, stripped to its essence, that's what the affirmative actions are, ordering him to stay and then bringing her down into what has been referred to in the jurisprudence as the snake pit, right where he was. The only thing I don't have is olfactory senses to say she walks right by him. And he obviously sets him off within seconds, not unlike what we know. But when you're comparing state-related, state-created danger, you have to compare her vulnerability that she had to harm to something that they did that made it a greater harm. Now, are you comparing her vulnerability to Sobrel's level of risk exposure, had she never interacted with the police at all, or whether what was her risk exposure if the officers had disarmed Reyes right away, or to her exposure had she not been allowed to cross paths with Reyes, or to her level of exposure had the officers not acted at all and just let her go home on her own? I think it could be any or all of the above. First, do no harm. Once she comes in seeking sanctuary, they had about five possibilities there. One, she never walks in the door. She's not seeking sanctuary. She's seeking an order. I appreciate that. I'm speaking metaphorically, Your Honor, and I apologize. It should be more concrete. If she doesn't go in there, the odds are she's alive today. I don't know that, but I know one thing. When she went in there, she came out dead. When they order him to remain, knowing that he's armed and unsupervised, they know that they are violating every one of their procedures. They are putting her in a worse position. I mean, let's see. If you take a drunk woman and bring her into your station and then say, you know what, you're not drunk anymore, have a nice walk home in the cold. That's neat, but this is one where actually she's in the station and she's still alive when she leaves the station. What happens is because of the particular configuration of police vehicles, you can open them from the outside, you can't open them from the inside. And how was anyone to know? How was anyone not to be shocked by what Reyes did? Because wasn't it true that he really had not acted out physically here to four prior to the police car incident when he pulled out his gun and shot her? When you say acted out physically, you mean ever, or you mean on this particular evening? On this particular evening. On this particular evening, he appeared, according to their testimony, to be under control. Do I agree with your proposition that it flows from that? No. It's not the nature of domestic violence generally, and that was not his relationship with her. He definitely had left threatening messages on her phone above and beyond the suicide message. Not, I love you, I want you back. I heard you back with this other guy and you're a whore. That's the message he left. That's what set her to coming to look for a restraining order. The messages were becoming increasingly threatening. Wouldn't her case have been, or her state's case, have been enhanced had she told Younger about the suicide message of Reyes? You know, it is the most amazing thing. And we don't know that she didn't. We have Younger's statement that she didn't. She played messages for him, and we assume that she did not play that message. That message was on her work phone as opposed to her cell phone. But it's amazing to me, in the realm of learned helplessness, that this woman who let the first temporary restraining order go on its return date and now is trying to save the guy's career just now. You know, I'm afraid because I want his weapons taken away, and this is the second restraining order I'm getting against him in three months. But, you know, I'm not looking to file criminal charges. You lose. You're trying to help the guy out. I guess no good deed goes unpunished, Your Honor. But, again, you're putting yourself then in the position of what the police officers knew at the time. And I keep coming back to the theme that, yes, there may be negligence. Yes, there may be something that the police officers need to sort out among themselves as to what they do in the future. But in this particular case, looking back at this horrible incident, you have to ask yourself what did they affirmatively do that created danger for her beyond that which anyone thought existed at the time he was there? When I say they ordered him to remain, understand that any other civilian wouldn't have made it through the door, would have been detained. Now, I get the fact that from a Castle Rock perspective, if I allege that they failed to serve the restraining order on him or failed to detain him, that I'm now sucked into the argument that it's a non-action rather than an affirmative action. But they ordered him to remain. He was invited in. Why? Because they were literally giving a special benefit to one of their own. That's inescapable from these facts. Why create a greater danger by ordering him to stay in the station than by telling him to go out of the station? Because at least he's not in proximity to shooter at that point. Because you don't know where he is. You don't know where he is when he's outside of the station. Judge, you're telling me there are only two possibilities, order him to remain or order him to leave. How about order him to go down to Internal Affairs where he was going to have to go once the TRO was issued? How about order him to go to the other district headquarters like Sergeant Reynolds did on the prior restraining order? But I don't think you would order him to Internal Affairs until you had the order in hand. They had the order in hand. She shot half an hour later. Not when they told him to stay. Not when they told him to go down to the cage and stay there. No, but they knew that an order was forthcoming. This is a domestic violence restraining order. She says she wants it. She's got a prior order. They know she's going to get it. Younger tells them, I'm going to do up the order. And the fact that the municipal judge was reluctant in the mind of the people involved is that's the way municipal judges interact with police, whether it's in Jersey City or not. He's saying, golly, you guys are minimizing everything about this, so I'm reluctant based on your minimization to do this. Will you vouch for him? No, I can't. You know, once he had the order, didn't Younger go and attempt to enforce the order? No, he didn't. I thought Reyes ran away from him. Ran away from him? With all due respect, Judge, yeah, he ran away from him. He said he turned and ran out the door, and I went right after him. Well, you're two feet away from the guy, and he's walking or running out a door, and he goes 20 feet across the street and opens the door and shoots the woman and then shoots himself. And Younger says, I got to the door and I heard the shots, and I thought they might have been coming from the high school down the street. Now, I don't know how hard he was chasing after him, but somehow the guy managed to get 30 feet across the street and unload his revolver. Well, the issue is when he tried to take the gun away. No, no, no. No, it's not. I'll tell you what, with all due respect, Your Honor. All right, what is the affirmative act? The affirmative act is ordering him to stay there and then bringing her down in front of him. Those are the two affirmative acts. But when he says, would you meet me over there behind the sergeant's desk because I don't want to embarrass you, that's not happening to me. They have a restrainer on their hand at 858, and this is 924 half an hour later. I'm going down on the ground, and I'm being told, take that gun off of you right now. I'll be doing it like this. So this notion that because they didn't want to embarrass him in front of his friends, that they're going to invite him over back there, that he's trying to restrain him, no, he's not trying to restrain him. If they were trying to restrain him, they would have restrained him. They made no effort to do that, and I get the fact that no effort is not affirmative. But affirmatively, they brought him there, and then they brought her to him. But once again, what you're talking about is it's quite possibly, probably very clearly negligent behavior on their part. But that's not what the case law is. There has to be an affirmative act that police officers do that puts her in a situation of knowing that it would be greater danger to put her in that situation. And you keep saying negligent. I keep looking at you like I don't know if we're on the same planet. This is a reckless disregard for human safety. Sometimes I wonder that too, but that's okay. And I have the alien's ears in this room. I understand that. But it is with utterly reckless disregard for her safety that they do that, that they put the armed guy in her presence. That's the affirmative act. And how's this? Forgetting for the moment whether one was substantive versus procedural due process, wasn't Borrella even a tougher situation than this? Wasn't Castle Rock even a tougher situation than this? No. Well, in Castle Rock the tort fees or the bad guy was not physically present. Borrella was, I think, more egregious, and they tried to make the distinction when the assailant is physically present. And he's saying, don't worry, guys, I got this handled. I'll see you later. And they physically come out and then they leave, if I understood the facts of Borrella correctly. They didn't take his gun away a number of times when they had the opportunity to do so. Yeah, but at the end of the day they walked away. They didn't say, if I wanted to analogize Borrella to this case. But these police officers didn't walk away. They were doing their job that evening, maybe not as well as one would have hoped, certainly in hindsight. But it's a tough standard that you have. I mean, you know, that's what the Supreme Court has given us in Descheny and in Castle Rock. It's a very tough standard. I'm way over time. Go ahead. The last thing I want to leave you with is this case is clearly, clearly, if you read it carefully, is clearly distinguishable from Castle Rock and Borrella. This is we have them here in our building. They're in our house, and we're putting them together. All we have to do is take them apart. Instead, we put them together. If that's not sufficient affirmative conduct, then I guess 1983 actions against police officers in this kind of scenario will forever be barred. And that's really the reach of potential opinion coming out of this case. Thank you. Thank you very much. Mr. Levy. I'll be brief. Borrella involved matters in which there were repeated threats of violence. And this court held no state-created danger that qualified immunity should prevail to protect those officers. We're talking about a standard of care. If it's a split-second decision, which is what I'm alleging with respect to at least the officer bringing her down the stairs, you need to demonstrate an intent to harm. If it's a decision involving minutes to hours, the standard is a conscious disregard of a great risk of harm. And the question that I pose to the court is, where is the information upon which an officer would then base that there is a risk of harm in this case? This is verbal abuse with no history or reporting of violence. And the suicide note was a written note, not a telephone call. Had there previously been any type of allegation of violence? With him? Not within the knowledge of these officers. The last allegation involved domestic violence complaint with involved, and I think the tape recordings that are part of the record are, is it the same as last time? Yes. Verbal abuse? Yes. That was the knowledge that these officers had. The bottom line is, was that sufficient information for any of these officers to believe that the ultimate harm, which was murder, was foreseeable? This case does not shock the conscience. The officers were acting in a way based upon the information that they had. As Your Honor pointed out, this may be a negligence case. Perhaps. But if the affirmative acts are escorting down and ordering him to stay, that is nothing unless they take the gun away. In other words, it all derives from the fact that it was a failure to take a gun away. And they couldn't take the gun away until and unless an order was signed. The order was signed at 858? Yes. Wouldn't the thing to have done would have been to go down and get the gun from him before they escort her out? I mean, wouldn't that be the logical thing to do? Not according to the New Jersey legislature, because the New Jersey legislature nine months later said you can't do that. Can't do what? Take a gun away from an on-duty officer when he's on duty, when there's a domestic violence complaint filed against him. Nine months later. Even though you have an order of the court? That's correct. Well, the order won't, in other words, you cannot enforce taking the gun away until he's off duty. Why is that? You know, I'd have to look at the legislative history. Well, then the officer in charge declares him off duty and takes the gun away. Well, very well could do that. I'm not suggesting, as Your Honors pointed out, that there couldn't have been something better done under these circumstances. However, absent the history of violence and with the history of the officer complying with lawful orders that were provided to him, the fact that when he did walk by, when she did walk by him, that's not where he was shot. He ran out the door. This is not a case of state-created danger. Borrella was far more substantial with respect to the facts that were alleged. The Supreme Court, the United States Supreme Court has said in Castle Rock that there is no constitutional right to have an order implemented. So the question then is the manner of implementation is certainly not a case in which there is a constitutional right which requires an ignoring of the immunities which these officers should have. In Judge Roth's case, said in a close case it ought to be to the benefit of the officers. This is not a close case. Mr. Forlong is very persuasive in attempting to say that, you know, this day somehow is an affirmative act. It is not an affirmative act which has resulted in a constitutional deprivation. Thank you. Thank you. Thank you to both counsel for well-presented arguments. We'll take the matter under advisement.